IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

THURSTIE SHERMAN,         )
      Plaintiff,           )
                        )
v.                          )       Civil Action No. 4:13-cv-00020
                        )
CAROLYN W. COLVIN,      )
Acting Commissioner of Social Security,   )       By:    Joel C. Hoppe
      Defendant.          )             United States Magistrate Judge

**REPORT AND RECOMMENDATION**

Plaintiff Thurstie Sherman brought this action for review of the Commissioner of Social Security's (the "Commissioner") decision denying her claim for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–433, 1381–1383f. Both parties have moved for summary judgment and filed briefs in support. (ECF Nos. 16, 17, 19, 20). On appeal, Sherman argues that the Commissioner erred in assessing her residual functional capacity ("RFC"), specifically by failing to consider (and give controlling weight to) the opinion of her treating oncologist, failing to account for her fatigue and exhaustion, and placing too much emphasis on part-time work she performed during and after her chemotherapy. The Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), and this case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). After carefully reviewing the record, I find that remand is necessary to allow the Commissioner to explain how she interpreted the treating oncologist's opinion and what weight she gave to it. Accordingly, I recommend that Sherman's motion be granted, the Commissioner's motion be denied, and the case be remanded for further administrative proceedings pursuant to section four of 42 U.S.C. § 405(g).

## I.    Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final determination that a person is not entitled to disability benefits. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence," *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)).  However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a),

416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is

disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe

impairment; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and if not (5) whether he or she can perform other work. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4); *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983).

The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At

step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II.  Procedural History

Sherman was born in 1970 (Administrative Record, hereinafter "R." 28, 177), and at the

time of the ALJ's decision was considered a "younger individual" under the Act. 20 C.F.R.

§§ 404.1563(b), (c), 416.963(b), (c). She has completed a year of college as well as paramedic

training and has worked as a hospital registrar, paramedic, and most recently as the owner and

operator of a bridal boutique. (R. 181–82, 187–90.) She alleges that she has been disabled since

February 25, 2011, primarily due to breast cancer. (R. 177, 181, 203.) After rejecting Sherman's

application initially and on reconsideration (R. 47–86), the Commissioner convened a hearing

before an Administrative Law Judge ("ALJ") at Sherman's request on August 8, 2012. (R. 34–

46.)

On August 30, 2012, the ALJ issued his decision finding Sherman not disabled and

denying her benefits. (R. 17–33.) The ALJ found that Sherman has the severe impairment of

"stage 2 breast cancer status post lumpectomy," but that this impairment did not meet or

medically equal the severity of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22–

24.) He found Sherman's medically determinable mental impairments nonsevere. (R. 22.)

3

Adopting the findings of the state agency consulting physicians, the ALJ found that Sherman retained the capacity to perform light work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 24–28.) He found that Sherman retained the capacity to perform her past relevant work as a retail/boutique store owner and hospital registrar. (R. 28.) Alternatively, he found, based on the testimony of a vocational expert, that Sherman could perform other work existing in significant numbers in the national economy. (R. 28–29.) Accordingly, he found Sherman not disabled under the act. (R. 29.) The Appeals Council denied Sherman's request for review (R. 1–7), and this appeal followed.

### III.  Facts

*A.  Medical Records*

In mid-January 2011, Sherman noticed a lump in her left breast. (R. 249–50.) A mammogram revealed suspicious findings, and an ultrasound-guided biopsy confirmed the presence of breast cancer. (R. 268–70.) On February 25, Sherman underwent surgery to have the lump removed. (R. 257–61, 263–64.) A biopsy showed that the cancer was a stage II poorly differentiated infiltrating ductal carcinoma, with perineural invasion but without lymphovascular invasion, which was positive for HER2/neu, a gene that is associated with certain aggressive cancers. (R. 231–33, 259–61, 63–64.) A CT scan taken after the surgery showed no definite evidence of metastatic disease. (R. 236.)

Because Sherman's cancer posed a risk of recurring, Sherman's oncologist, Dr. Neil Schacht, recommended following up the surgery with chemotherapy. (R. 231–33.) Between April 12 and June 14, 2011, Dr. Schacht and Dr. Devinderpal Randhawa (another oncologist at Dr. Schacht's practice) treated Sherman with four cycles of Adriamycin (doxorubicin) and cyclophosphamide.

At her April 12 visit, Sherman reported insomnia and requested something to help her sleep; Dr. Schacht prescribed Trazodone. (R. 231–33.) On May 24, 2011, Dr. Randhawa reported that Sherman was tolerating chemotherapy well, but was depressed and tearful due to social issues and financial problems. (R. 220–21.) Sherman reported that she was trying to continue working during her chemotherapy. (*Id.*) At a physical exam with Dr. Lovetta Pugh on June 7, she complained of problems sleeping, fatigue, and nausea due to chemotherapy, but reported having a normal appetite. (R. 240–43.) On June 14, Dr. Schacht noted that Sherman was tolerating chemotherapy well except for increasing fatigue. (R. 302–03.) And on July 5, Dr. Randhawa noted that Sherman tolerated chemotherapy well and continued to go to her job despite some chemotherapy-induced fatigue. (R. 292–94, 405–07.) Sherman also complained of pain in her left arm, which she attributed to using her arm more than usual while measuring people for tuxedo fittings; Dr. Randhawa prescribed Motrin, which reduced the pain. (R. 283–84, 292–94, 399–401, 405–07.)

On July 5, 2011, Sherman began a regimen of twelve weekly injections of the chemotherapy drug Taxol (paclitaxel) and Herceptin (trastuzumab), a biopharmaceutical that slows the growth of HER2-positive cancers by binding to the HER2 protein. (R. 292–94.) The record before the ALJ contained notes from the first five cycles, from July 5, 2011, through August 2, 2011. (R. 274–75, 278–81, 283–84, 290–94.) Treatment notes from these visits indicate that Sherman was handling chemotherapy "well" or "fairly well," and that her principal complaint was fatigue. (*Id.*) At one visit, Sherman told the ALJ that she was "working daily." (R. 290–91.) Sherman complained of hot flashes in early July, which were treated with Neurontin (gabapentin). (R. 290–91.) She was diagnosed with mild anemia as well as vitamin B12 deficiency, which was treated with monthly B12 injections. (R. 276–84.) The record before

the ALJ also contained notes from an August 22, 2011, consultation with Dr. Peter J. Leider, which indicate that Sherman had an adequate appetite and had even gained 16 lbs since her diagnosis, but had no energy. (R. 322–27.) She also complained of hot flashes, numbness, generalized muscle weakness, "some depression and anxiety issues," and incontinence. (*Id.*) Dr. Leider informed Sherman that tiredness is a common side effect of chemotherapy. (R. 326.)

Notes from the remaining seven Taxol/Herceptin cycles, which continued until September 27, 2011, were submitted to the Appeals Council after the ALJ's decision. (R. 6, 364–92, 396–407.) These notes also indicate that Sherman tolerated her chemotherapy well but frequently complained of fatigue. (R. 364–80, 383–89.) At her August 16 visit, she reported that her fatigue was interfering with her job, but noted that she worked a wedding the previous Saturday. (R. 385–87.) Complaints of neuropathy in late August caused Dr. Randhawa to delay one dose of Taxol for a week, but an increased dose of Neurontin (gabapentin) provided relief. (R. 373–74, 378–80, 382–84.) On September 20, when Sherman received her last cycle of Herceptin and second to last cycle of Taxol, she reported that she was able to continue to work at her job and that she suffered from a little swelling in her right ankle after participating the previous weekend in the Walk for Hope, where she walked one lap. (R. 367–72.) When Sherman received her last cycle of Taxol the following week, she indicated that she was feeling well, but was happy that chemotherapy was ending. (R. 364–66.) At an office visit on October 17, 2011, Dr. Schacht noted that Sherman was doing well clinically. (R. 361–63.)

Following her Taxol/Herceptin regimen, Sherman began a regimen of radiation therapy in October 2011. (R. 316–21.)[1] At her first visit, she told Dr. Leider that she was having

---

[1] Medical records of Sherman's radiation and Herceptin treatments (R. 309-55), as discussed in this and the next paragraph, were submitted to and considered by the ALJ. (*See* R. 26-27, 36.)

difficulty sleeping but did not want to try any pills because they either did not work or caused her to feel hung over. (R. 321.) She reported that she had worked a weekend and visited her son the previous weekend after he graduated from Marine boot camp, but exerted herself through walking and other activities such that she had to use a wheelchair. (*Id.*) She was in reasonably good spirits, but Dr. Leider suspected that Sherman was struggling with side effects of her treatments and may have overlying depression as well. (*Id.*) Sherman tolerated radiation therapy fairly well, suffering from only mild radiation dermatitis. (R. 316–319.) She did complain of weakness, breast soreness, and fatigue. (R. 316, 317, 319.) At one visit, she broke down crying due to struggling with the psychological aspects of her diagnosis. (R. 318.)

On January 23, 2012, Sherman began the final phase of her treatment: a 40-week course of Herceptin injections. (R. 309–10.) Before her first injection, she reported to Dr. Randhawa that she was still suffering from chemotherapy fatigue. (R. 309–10.) Treatment records indicate that Sherman tolerated Herceptin well, with her principal complaint being fatigue. (R. 313–15, 332–34, 340–49, 435–46.) In February, she complained of insomnia, although Xanax provided some relief, and reported she was working a lot. (R. 313–15.) She suffered from leg pain and radiculopathy in April, but these symptoms resolved without treatment. (R. 328–37.) In May, she reported achy joints after a busy weekend working a double wedding. (R. 340–42.) At a June follow-up, she complained of fatigue, memory loss (although Dr. Schacht noted that Sherman "seem[ed] extremely lucid and sharp"), headaches, occasional foot swelling, and nausea and vomiting, especially the week after her injections. (R. 346–49.) Dr. Schacht suspected that her headaches were probably stress-related, but her other side effects were due to the large Herceptin doses she received every three weeks. (*Id.*) He offered smaller but more frequent Herceptin injections to reduce side effects, but Sherman refused. (*Id.*) In early July,

Sherman found a lump on her left breast, but a mammogram on July 11 indicated that the mass was benign. (R. 352–55, 432, 438.)

The record before the ALJ ends on July 11, 2012, but Sherman submitted some later records to the Appeals Council. A July 25 ultrasound confirmed that the mass in her left breast was cystic rather than cancerous. (R. 433–34.) On July 30, she received another round of Herceptin injections. (R. 735–37.) She complained of anxiety and requested a Xanax refill, which Dr. Randhawa provided. (*Id.*) At an office visit two weeks later, Dr. Randhawa indicated that Sherman was tolerating Herceptin well, despite complaints of fatigue, malaise, edema, nausea and vomiting, headache, memory loss, depression, anxiety, and insomnia. (R. 439–43.) Dr. Randhawa suggested antidepressant therapy, but Sherman refused. (*Id.*) At her next Herceptin injection the following month, Sherman reported that she continued to have fatigue and was unable to work much because of it. (R. 444–46.)

Sherman also submitted to the Appeals Council a letter from Dr. Schacht dated November 24, 2011, that discusses Sherman's treatment regimen and its effects on her. (R. 408.) Dr. Schacht noted that Sherman was "stricken with a case of aggressive/invasive breast cancer," and that "[a]ggressive features of her disease are a poorly differentiated tumor, estrogen/progesterone receptor negativity, and HER gene amplification positivity." (*Id.*) He noted that she was treated with four cycles of Adriamycin/Cytoxan chemotherapy administered once every three weeks followed by 12 weekly doses of Taxol and Herceptin, followed by radiation therapy. (*Id.*) He added that Sherman would then be treated with "Herceptin … for an entire year." (*Id.*) Dr. Schacht observed that invasive breast cancer is a deadly disease and that, even with surgery, Sherman's cancer had a 20% to 30% chance of recurring, which "mandated the need for adjuvant chemotherapy and radiation as noted above." (*Id.*) He noted that these

treatments have left Sherman "extremely exhausted with severe, extreme fatigue," and that "[h]er overall exhaustion is a limiting factor in [Sherman's] ability to work." (*Id.*) He also noted that Sherman "has been rendered fearful of disease recurrence and has to live with that for the rest of her life." (*Id.*)

B.      *Sherman's statements and testimony*

In written statements to the agency, Sherman indicated that she works at her bridal shop just three days per week. (R. 194.) On off days, she watches TV, sits on her porch, and walks outside in the evening. (*Id.*) Because of her treatment, she is less able to move quickly, be in the sun (due to photosensitivity), lift, reach, cook full meals, clean, and take care of pets. (R. 195–97.) She needs help with laundry and finds housework and yard work difficult. (R. 196, 198.) Her photosensitivity also limits her driving. (R. 198.) She shops weekly for groceries, which takes her an hour to an hour and a half. (*Id.*) She has some memory problems, which she attributes to chemo, but can complete tasks, concentrate, and understand and follow instructions (although sometimes she forgets details). (R. 200.) She estimated that she can lift up to 5–10 lbs, walk about 50 feet, and climb about 10 steps, and claims that she is unable to fully extend her arms. (*Id.*) She deals "fine" with authority figures and handles stress and changes in routine "pretty good." (R. 201.) However, she reported being "depressed, worried, and stressed" about her medical and financial situation, and that her anxiety interferes with her sleep. (R. 202.)

Sherman testified in support of her application at the August 8, 2012, ALJ hearing. (R. 37–41.) Since her diagnosis, Sherman explained, she was able to work at her bridal shop just 12 hours per week and relied on help from friends and family to keep her business running. (R. 38.) Due to her surgery, she is limited in her ability to lift things with her left arm, and the IV port interferes with use of her right arm. (R. 38.) Chemotherapy has made her so weak that she "may have five minutes of energy every couple of hours." (R. 38.) Sherman estimates that she

could walk maybe 20–30 feet before having to rest, but that "[i]t's a task to even just walk ten feet." (R. 40.) She suffers from nausea "[u]sually every morning" and often has to lie down and rest "pretty much the entire day." (R. 40.) She can vacuum, but she cannot take out the garbage. (R. 40.) She can get into the tub, but her husband has to help her get out. (R. 40–41.) Showering "is pretty much out of the question" because she is "so unsteady." (R. 41.)

## IV.  Discussion

Sherman argues that the ALJ erred in determining her RFC in several respects. First, she asserts that the ALJ failed to consider the extreme fatigue and exhaustion caused by her chemotherapy. (Pl. Br. 17.) Second, she argues that the ALJ improperly used her part-time work activity to discount her credibility. (Pl. Br. 17–18.) Third, she accuses the ALJ of failing to consider the opinion of Dr. Schacht that she suffers from severe fatigue due to chemotherapy. (R. 18–20.) I will address these issues in turn.

*A.     Failure to consider fatigue*

Sherman first argues that the ALJ failed to "consider the extreme fatigue and exhaustion caused by her chemotherapy and radiation treatment." (Pl. Br. 17.) I disagree.

When a claimant alleges she is disabled due to symptoms like pain or fatigue, regulations require the ALJ to follow a two-step process in evaluating subjective symptoms and determining the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529, 416.969; *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether objective medical evidence shows "'the existence of a medical impairment which results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged.'" *Craig*, 76 F.3d at 594 (quoting 20 C.F.R. § 416.929(b)). To clear this threshold, the claimant must show "by objective evidence … the

existence of a medical impairment 'which could reasonably be expected to produce' the actual

pain [or other symptom], in the amount and degree, alleged by the claimant." *Id.*

If the claimant has made this step one showing, the ALJ must proceed to the second step

and evaluate the intensity and persistence of a claimant's subjective symptoms, taking into

account the claimant's statements along with "all the available evidence, including the claimant's

medical history, medical signs, and laboratory findings; any objective medical evidence of pain

(such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.);

and any other evidence relevant to the severity of the impairment, such as the claimant's daily

activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.*;

20 C.F.R. §§ 404.1529(c), 416.929(c). If the objective medical evidence by itself supports the

claimant's allegations about the intensity and persistence of subjective symptoms, the ALJ must

accept those allegations as true. Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *1.

However, if the claimant's "statements about pain or other symptoms are not substantiated by

objective medical evidence, the adjudicator must … make a finding on the credibility of the

[claimant's] statements about symptoms and their functional effects." *Id.* at *4.

Here, the ALJ followed the two-step process for evaluating subjective symptoms. The

ALJ noted Sherman's testimony regarding her subjective symptoms including fatigue and

recognized that the two-step process applied. (R. 24–25 (citing 20 C.F.R. §§ 404.1529, 416.929;

SSR 96-4p, SSR 96-7p).) He then summarized Sherman's treatment records, noting the many

reports of fatigue contained in those records. (R. 25–27.) Based on her medical records, he

concluded that Sherman's medically determinable impairments could reasonably be expected to

cause some of her alleged symptoms. (R. 27.) However, he found that her statements concerning

the intensity, persistence, and limiting effects of her symptoms like fatigue were not credible to

the extent that they precluded her from performing light work. (R. 27.) In explaining his credibility determination, he specifically noted that Sherman "complained of some fatigue," but "has continued to work." (R. 27.) The ALJ explained that he found Sherman not fully credible because her allegations lacked support in her treatment records and were inconsistent with her work activity and activities of daily living and because Sherman made inconsistent statements regarding her work history. (*Id.*)

Thus, the ALJ considered Sherman's complaints of fatigue—he just didn't reach the result she would have preferred.

### B. *Credibility assessment*

Next, Sherman challenges the substance of the ALJ's credibility determination, arguing that the ALJ improperly discounted her credibility in part because she worked part time. (Pl. Br. 17–18.) Sherman notes that the ALJ previously found that she never engaged in substantial gainful activity, and that there "is nothing contradictory about" her reports of part-time work "which would undermine [her] credibility." (*Id.*)

Once the claimant has shown the existence of an impairment that could reasonably be expected to produce the alleged pain or other symptoms, the ALJ may not dismiss a claimant's testimony regarding the intensity and persistence of those symptoms "solely because the available objective medical evidence does not substantiate" those statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Hines v. Barnhart*, 453 F.3d 559, 563–64 (4th Cir. 2006); *Craig*, 76 F.3d at 595. Thus, on the second step, subjective evidence alone may suffice to establish that pain or other symptom is disabling. *Hines*, 564 F.3d at 564–65. However, a claimant's "symptoms, including pain, will be determined to diminish [his or her] capacity for basic work activities … to the extent that [the claimant's] alleged functional limitations and

restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Provided he stays within these bounds, "[i]t is the province of the ALJ to assess the credibility of … a claimant." *Ratliff v. Barnhart*, 580 F. Supp. 2d 504, 517 (W.D. Va. 2006). The ALJ must articulate "specific reasons for the [credibility finding]," and these reasons must be "supported by the evidence in the case record." Social Security Ruling 96-7p, 1996 WL 374186, at *2. The ALJ's reasons "must be sufficiently specific to make clear" to the claimant and the reviewing court how the ALJ weighed the statements and why. *Id.* at *4; *Dunn v. Colvin*, 973 F. Supp. 2d 630, 639 (W.D. Va. 2013). So long as the ALJ has followed the regulations, reviewing courts must defer to the ALJ's determination if it is reasonable. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (citing *Craig*, 76 F.3d at 589); *see also Dunn*, 973 F. Supp. 2d at 640 ("[T]he question for the Court is whether the ALJ applied the proper legal standard in assessing Plaintiff's credibility, and whether the ALJ's decision is supported by substantial evidence.").

Sherman is correct to point out that part-time work does not preclude a finding of disability. In some cases, part-time work may constitute substantial gainful activity. 20 C.F.R. §§ 404.1572(a), 416.972(a); *Garnett v. Sullivan*, 905 F.2d 778, 780–81 (4th Cir. 1990) (substantial evidence supported ALJ's finding that one hour per day driving school bus constituted substantial gainful activity); *but see Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978) ("[T]he ability to work only a few hours a day or to work only on an intermittent basis is not the ability to engage in 'substantial gainful activity.'"). A claimant whose part-time work constitutes substantial gainful activity—which is defined as "work activity that involves doing significant physical or mental activity" that is performed "for pay or profit," 20 C.F.R.

§§ 404.1572, 416.972—cannot be disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). But here, the ALJ found that Sherman's activities did not constitute substantial gainful activity because "her earnings record shows no wages since 2009." (R. 22.)

Even if a claimant's part time work falls short of substantial gainful activity, that work "may show that [the claimant] is able to do more work than [he or she] actually did." 20 C.F.R. §§ 404.1571, 416.971. Work activity that is not both substantial and gainful is still "evidence relevant to the severity of [the claimant's] impairment[s]," and as such must be considered in assessing the severity of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ therefore properly considered Sherman's work activity in evaluating the credibility of her subjective complaints. Moreover, some of Sherman's statements suggest that her work activity was not so limited as she now claims. In particular, the ALJ noted that Sherman reported working daily in July 2011, working "a lot" in February 2012, and working a double wedding in May 2012. (R. 27, 290–91, 313–15, 340–42.)

Furthermore, the ALJ relied on more than just Sherman's work activity in finding her less than fully credible. The ALJ observed that Sherman's testimony that she was nauseous almost every day during treatment (R. 40) was not consistent with treatment records, which contained only a few complaints of nausea. The ALJ also noted Sherman's daily activities as well as statements in treatment records that, aside from fatigue, she was doing well. (R. 27, 194–202.) This evidence provided a more than adequate basis for the ALJ to discount Sherman's allegations of disabling fatigue.

## C.  New medical opinion evidence

Sherman's principal argument is that the ALJ "failed to employ the legally proper method for evaluating" the opinion of Dr. Schacht, her treating oncologist, that she suffered from severe fatigue due to her chemotherapy. Sherman observes that "the ALJ apparently gave no

weight to [Dr. Schacht's] opinions … that overall exhaustion would be a limiting factor in her ability to work." (Pl. Br. 18.) "In fact," Sherman points out, "there is no discussion at all by the ALJ of Dr. Schacht's opinion or any inconsistencies between [that] opinion[] and the record evidence." (*Id.*) Sherman also contends that the ALJ erred in "fail[ing] to give appropriate reasons for rejecting [Dr. Schacht's] opinions … that Sherman would be limited in her ability to work because of her overall exhaustion and her mental condition concerning the recurrence of cancer." (Pl. Br. 19.)

Sherman is correct that the ALJ failed to consider or evaluate Dr. Schacht's opinion. But that was only because this evidence was not before the ALJ.[2] (*See* R. 6.) Exhibits 8F through 12F

---

[2] Inexplicably, Sherman's attorney does not mention this fact once in the brief he submitted in support of her summary judgment motion. Not until the Commissioner submitted her brief was this fact called to the Court's attention. Unfortunately, the Commissioner's explanation also fell short. The real story behind counsel's seemingly tardy production of these records is revealed only in the brief counsel submitted to the Appeals Council. (R. 214–15.) There, counsel states that he submitted these records electronically in March 2012, well before the ALJ's decision. (*Id.*) To support this assertion, he attached receipts for these electronic submissions that he received from the agency. (R. 216–19.) These submissions were not among those the ALJ admitted into evidence at the hearing, (R. 36) and it appears that they were not added to the record until counsel resubmitted them in connection with his request for Appeals Council review.

The Commissioner's regulations provide that, "if possible" a claimant should submit evidence "with the request for hearing or within 10 days after filing the request." 20 C.F.R. § 404.935. The claimant and the Commissioner share the responsibility to ensure that the record is complete and correct. *Id.* ("Each party shall make every effort to be sure that all material evidence is received by the administrative law judge or is available at the time and place set for the hearing."). A claimant also has the right to submit evidence at the ALJ hearing. 20 C.F.R. § 404.950(a). Finally, the ALJ may reopen the record to receive new evidence at any time before mailing a notice of decision. 20 C.F.R. § 404.944.

Here, Sherman requested a hearing on September 13, 2011. (R. 99–100.) In July 2012, well after Sherman sent these records, the agency sent her a notice of hearing informing her that a hearing had been scheduled for August 8, 2012. (R. 112–32.) The hearing notice invites the submission of further evidence either before or at the scheduled hearing and offered Sherman the opportunity to review her file either before the day of the hearing or on the day of the hearing itself provided she "c[a]me in at least 30 minutes before the time set for [her] hearing." (R. 114.) At the hearing, the ALJ reviewed the list of exhibits in the file and asked if counsel had any objection to admitting those exhibits into evidence; counsel had no objection. (R. 36.)

were not added to the record until the case was before the Appeals Council in connection with Sherman's request for review. (*Id.*)

When, after an unfavorable ALJ decision, a claimant offers new and material evidence to the Appeals Council, the Appeals Council must consider that evidence if it "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b); *Wilkins v. Sec'y of Health and Human Servs.*, 953 F.2d 93, 95 (4th Cir. 1991) (en banc). "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005) (quoting *Wilkins*, 953 F.2d at 95–96).

Even if it is confronted with new and material evidence that relates to the relevant period, the Appeals Council will grant review based on the new evidence only when "it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently in the record," including the newly-submitted evidence. 20 C.F.R. §§ 404.970(b), 416.1470(b). Despite Sherman's arguments to the contrary, the Appeals Council is not required to give reasons for denying review or to explain how it considered any additional evidence a claimant has submitted. *Meyer v. Colvin*, 662 F.3d 700, 704–06 (4th Cir. 2011). However, the reviewing court must consider the record as a whole, and not just the evidence before the ALJ, to determine whether substantial evidence supports the Commissioner's decision. *Wilkins*, 953 F.2d at 96; *Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999).

Here, the Appeals Council "considered" the letter and the other records in exhibits 8F through 12F, but determined, without further explanation, that the new information "does not

---

Because Sherman and the Commissioner both have a duty to ensuring that the record was complete, they share responsibility for the failure to incorporate exhibits 8F through 12F into the record before the ALJ.

provide a basis for changing the [ALJ]'s decision." (R. 1–2.) Such summary rejection of additional evidence makes review difficult, because the Court must examine the ALJ's decision in light of evidence that the ALJ never considered. *Ridings*, 76 F. Supp. 2d at 709; *Riley v. Apfel*, 88 F. Supp. 2d 572, 579–80 (W.D. Va. 2000); *see also Meyer*, 662 F.3d at 707 ("[T]he lack of such additional fact finding does not render judicial review 'impossible'—as long as the record provides 'an adequate explanation of [the Commissioner's] decision.'" (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983))). In performing this task, the Court may not attempt to weigh the new evidence or to resolve conflicts with existing evidence. *Dunn*, 973 F. Supp. 2d at 642 (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Instead, it must determine whether the evidence was "material"—in other words, whether the evidence had "a reasonable possibility of changing the outcome of the case." *Id.* (citing *Riley*, 88 F. Supp. 2d at 579–80). If the new evidence "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports," *id.*, then it is conceivable that the ALJ would have reached a different result upon considering it, and remand is required.

The Fourth Circuit's most recent published decision addressing this issue, *Meyer v. Astrue*, 662 F.3d 700 (4th Cir. 2011), sheds a lot of light on this case. Meyer, the claimant in that case, alleged that he was disabled from injuries he suffered after falling 25 feet out of a deer stand. *Id.* at 702. The ALJ found Meyer's complaints of "'constant, unrelenting' pain not entirely 'credible'" for a number of reasons. *Id.* at 703. One of these reasons was the ALJ's observation that "'[g]iven the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating physician' yet a 'review of the records … reveals no [such] restrictions.'" *Id.* (alterations in original). A month after the ALJ issued a decision denying Meyer benefits, Meyer submitted to

the Appeals Council a letter from his treating physician. *Id.* This letter "described Meyer's back injury and surgery and explained that Meyer's 'post-operative course has been complicated by chronic, debilitating back pain which was anticipated due to the magnitude of his injury.'" *Id.* Meyer's treating physician also "opined that Meyer's 'long term restrictions include no lifting greater than 10 pounds, avoid bending, stooping, squatting, and no sitting, standing or walking for more than 30 minutes without rest periods,'" and indicated that Meyer would require "'frequent follow-up and medical management'" and likely also surgical intervention in the future. *Id.* at 703–04. As it did here, the Appeals Council considered the letter but found that it did not provide a basis for changing the ALJ's decision. *Id.* at 704.

The Fourth Circuit reversed and remanded the case for further fact-finding based on the new evidence. *Id.* at 706–07. It emphasized that while the Appeals Council's failure to explain the new evidence made judicial review difficult, it did not make it "'impossible'—as long as the record provides 'an adequate explanation of [the Commissioner's] decision." *Id.* at 707 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). For example, in *Smith v. Chater*, the Fourth Circuit affirmed an ALJ decision despite new evidence because "'substantial evidence support[ed] the ALJ's findings.'" *Meyer*, 662 F.3d at 707 (quoting *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996)). On the other hand, the court explained, it reversed the ALJ's decision in *Wilkins* because "consideration of the record as a whole revealed that new evidence from a treating physician was not controverted by other evidence in the record" and therefore "the ALJ's denial of benefits 'was not supported by substantial evidence.'" *Id.* (citing *Wilkins*, 953 F.2d at 96).

The Fourth Circuit observed that the evidence in *Meyer* was "not as one-sided as that in *Smith* or *Wilkins*. *Id.* Thus, "[o]n consideration of the record as a whole," the court "simply

[could not] determine whether substantial evidence supports the ALJ's denial of benefits here."

*Id.* The court explained its reasoning as follows:

> The ALJ emphasized that the record before it lacked "restrictions placed on the claimant by a treating physician," suggesting that this evidentiary gap played a role in its decision. Meyer subsequently obtained this missing evidence from his treating physician. That evidence corroborates the opinion of Dr. Weissglass, which the ALJ had rejected. But other record evidence credited by the ALJ conflicts with the new evidence. The Appeals Council made the new evidence part of the record but summarily denied review of the ALJ decision. Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

*Id.*

The facts of this case parallel *Meyer*'s in several meaningful respects. In both cases, the record before the ALJ contained no opinion from a treating physician about the claimant's functional impairments, and the ALJ decision in each case expressly noted the absence of such an opinion. (*See* R. 28) ("No treating medical source has opined that the claimant is physically more limited than the above residual functional capacity.") Sherman, like Meyer, submitted an opinion from a treating physician to the Appeals Council after the ALJ denied review. The treating source opinion in each case was consistent with some evidence (a non-treating source opinion in *Meyer*; here the claimant's testimony and treatment records consistently noting fatigue) that the ALJ did not credit, but conflicted with other evidence (the claimant's reports to his physicians that his conditions had improved and his pain had decreased in *Meyer*, 662 F.3d at 703; here Sherman's work activities and statements in treatment records indicating that she was doing well) that the ALJ did credit. In both cases, "no fact finder … made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Meyer*, 662 F.3d at 707.

That said, Sherman's case presents a closer call than Meyer's, primarily because Dr. Schacht's letter says a lot less than Meyer's treating physician's did. As the Commissioner correctly points out (Def. Br. 13), Dr. Schacht does not identify specific functional limitations, but simply states that Sherman's treatments left her "extremely exhausted with severe, extreme fatigue," that "[h]er overall exhaustion is a limiting factor in [her] ability to work," and that "she has been rendered fearful of [relapse] and has to live with that for the rest of her life." (R. 408.) Depending on how he interprets Dr. Schacht's opinion, the ALJ could still say that "[n]o medical source has opined that the claimant is more physically limited" than his light RFC. (R. 28.)

However, the ALJ could also fairly read Dr. Schacht's opinion as supporting a more limited RFC. Had he so interpreted Dr. Schacht's opinion, and had he given it significant weight, he may well have limited Sherman to sedentary work and imposed additional non-exertional limitations on her functional capacity. Restriction to sedentary work would eliminate all of the jobs suggested by the vocational expert and all past relevant work as generally performed, except hospital registrar. (R. 42–44.) If the ALJ imposed additional non-exertional limitations, then Sherman's ability to perform her past work as a hospital registrar would be put into question. The vocational expert testified that someone with Sherman's restrictions as the ALJ assessed them could perform this work and did not offer an opinion as to whether a more limited individual could as well.[3] (R. 42–43.) Interpreting ambiguous evidence, like resolving conflicts in the evidence, is "quintessentially the role of the fact finder." *Meyer*, 662 F.3d at 707; *Andrews v. Shalala*, 53 F.3d 1035, 1040 (9th Cir. 1995). And *Meyer* makes clear that district courts may not undertake this sort of fact-finding in the first instance. *Meyer*, 662 F.3d at 707.

_____

[3] In response to questioning from Sherman's counsel, the VE did testify that someone who would have to lie down several times per day would not be able to do Sherman's past relevant work or any of the light jobs the VE identified in response to the ALJ's hypothetical. (R. 44.)

The Commissioner argues that remand is unwarranted because "Dr. Schacht did not support his statement with any supporting medical evidence" and because his statement "was inconsistent with the treatment notes which indicated that Plaintiff was tolerating her treatment well." (Def. Br. 13.) This argument misses the mark for two reasons. First, in his November 2011 opinion, Dr. Schacht noted Sherman's diagnosis, length of treatment, and course of treatment, including one year of chemotherapy. Dr. Schacht also linked her treatment to her fatigue—a side effect that he, and other physicians, consistently documented in treatment records. Second, even if the reasons proposed by counsel for the Commissioner may provide adequate grounds for affording less weight to Dr. Schacht's opinions, they are not the ALJ's reasons, and as such the Commissioner may not rely on them on review. *Patterson v. Bowen*, 839 F.2d 221, 225 n. 1 (4th Cir. 1988) (cting *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). "[T]he court's task is to analyze the ALJ's decision itself, not the Commissioner's brief, and determine if that decision is supported by substantial evidence." *Grochowski* ex rel. *Becinski v. Astrue*, Civ. No. 08-86, 2009 WL 3152465, at *4 (W.D. Pa. Sept. 30, 2009). For now, it is enough to note that an ALJ must evaluate a medical opinion even if it is less than "well-supported by objective medical findings" (Pl. Br. 13–14 (citing 20 C.F.R. § 416.927)); *Tucker v. Astrue*, 897 F. Supp. 2d 448, 465 (S.D. W. Va. 2012) (citing Social Security Ruling 96-2p), and that Dr. Schacht's opinion is not so inconsistent with his treatment notes as to render it immaterial, *cf. Rowland v. Colvin*, No. 4:13-cv-00007, 2014 WL 2215884, at *16 (W.D. Va. May 29, 2014) (finding that doctor's opinion that claimant suffered severe medication side effects was not material because it was flatly "inconsistent with his own treatment notes, which repeatedly indicate that Rowland experienced no adverse effects from his pain medications"). Without any evaluation of Dr. Schacht's opinion by the fact-finder, I cannot recommend affirmance in this case.

## V.  Conclusion

For the foregoing reasons, I respectfully recommend that Sherman's motion for summary judgment be **granted**, the Commissioner's motion for summary judgment be **denied**, and the case be **remanded** to the agency pursuant to sentence four of 42 U.S.C. § 405(g).

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review.  At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: June 19, 2014

Joel C. Hoppe
United States Magistrate Judge